**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**

**BEVERLY HAYHURST,**

       **Plaintiff,**

**v.**                            **Civil Action No.: 2:13-CV-36
(JUDGE BAILEY)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

       **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING
THAT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10] BE GRANTED IN
PART, DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [17] BE DENIED IN
PART, AND THE CASE BE REMANDED TO THE ALJ WITH INSTRUCTIONS**

## I.  <u>INTRODUCTION</u>

On May 22, 2013, Plaintiff Beverly Hayhurst ("Plaintiff"), by counsel Montie VanNostrand, Esquire, filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (ECF No. 1). On July 31, 2013, the Commissioner filed an answer and the administrative record of the proceedings. (ECF No. 6; ECF No. 7). On August 29, 2013, and November 27, 2013, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (ECF No. 10; ECF No. 17). Following review of the motions by the parties and the administrative record, the undersigned now issues this Report and Recommendation.

## II.  <u>PROCEDURAL HISTORY</u>

On June 29, 2007, Plaintiff filed her first application under Title II of the Social Security

Act for Disability Insurance Benefits ("DIB") and a Title XVI application for Supplemental Security Income ("SSI"), alleging disability that began on May 1, 2006. (R. 296, 301). These claims were initially denied on November 1, 2007. (R. 163-66). The claim was denied again upon reconsideration on June 30, 2008. (R. 206, 209). On August 7, 2008, Plaintiff filed a written request for a hearing (R. 212), which was held before United States Administrative Law Judge ("ALJ") J.E. Sullivan on September 29, 2009 in Morgantown, West Virginia. (R. 66). Plaintiff, represented by counsel, appeared and testified, as did James Ganoe, a vocational expert. (*Id.*). On March 15, 2010, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 167-83). On April 20, 2011, the Appeals Council remanded this case. (R. 189-92). On September 14, 2011, ALJ Mark M. Swayze held a second administrative hearing. (R. 114). Plaintiff again appeared and testified, represented by counsel. (*Id.*). Dr. Larry Kontosh, a vocational expert, also appeared and testified. (*Id.*). On November 10, 2011, ALJ Swayze issued an unfavorable decision, denying Plaintiff's claim for benefits. (R. 17-51). Plaintiff appealed ALJ Swayze's decision to the Appeals Counsel on December 20, 2011. (R. 15). Her request for review was denied by the Appeals Council on April 11, 2013, making the ALJ's decision the final decision of the Commissioner. (R. 1-6).

## II.   BACKGROUND

### A.   *Personal History*

Plaintiff was born on January 3, 1967, and was forty years old at the time she filed her first SSI claim. (R. 296, 301). Plaintiff dropped out of high school in tenth grade. (R. 477). She completed her GED in 1993. (R. 130). After a twelve year marriage, Plaintiff and her husband divorced in 1995; Plaintiff reported that her ex-husband physically abused her throughout the

marriage. (R. 464). Since 2001, Plaintiff only worked one job at an ice cream stand for approximately two months. (R. 131-33, 524). Plaintiff previously worked as a waitress for a total of six years. (R. 133, 487). She currently lives alone in an apartment building. (R. 128). At the time she filed her initial claim Plaintiff was single and had two adult children, neither of whom were classified as dependents. (*Id.*)

## B. *Medical History*

The record indicates Plaintiff has a significant history of mental illness and alcohol abuse. Plaintiff attributes the development of her mental health problems to the death of her brother and sister in 2002, (R. 377, 462) and then the death of her mother in 2006. (R. 377). In addition, Plaintiff reported that her ex-husband physically abused her and her grandfather and father sexually abused her as a child. (R. 477). Plaintiff's diagnosed mental illnesses include depression, society anxiety in the form of schizotypal personality disorder and type two bipolar disorder. These mental health issues have led to physical ailments, including muscle spasms in Plaintiff's neck and shoulders and headaches. Plaintiff also alleges a range of physical impairments, including fibromyalgia, chronic cervical strain with degenerative disc disease, restless leg syndrome, etc. The following medical history provides an overview of Plaintiff's treatment with each of her providers as well as a summary of the evaluations and reports conducted by consultative examiners.

### 1. Treating and Examining Physicians

#### a. Plaintiff's Treating Physician, Dr. Jessica Murphy

Dr. Jessica Murphy served as Plaintiff's primary care physician from 2007 through 2011 and treated Plaintiff for both her physical and mental impairments. Plaintiff had appointments

with Dr. Murphy on August 18, 2005, April 24, 2007, May 14, 2007, May 29, 2007, July 26, 2007, August 21, 2007, November 26, 2007, January 28, 2008, March 24, 2008, April 7, 2008, April 23, 2008, May 21, 2008, August 19, 2008, October 20, 2008, January 12, 2009, April 28, 2009, October 13, 2009, October 20, 2009, November 17, 2009, February 1, 2010, March 30, 2010, June 21, 2010, January 19, 2011, May 2, 2011, May 25, 2011 and August 1, 2011.

In 2007, Dr. Murphy initially diagnosed Plaintiff with bipolar mood disorder, alcoholism, major depression, schizotypal personality disorder and cervico-thoracic spasm. In 2008, Dr. Murphy added chronic asthmatic bronchitis, hypothyroidism and pedal edema as diagnoses. In 2008, Plaintiff's diagnosis also included chronic cervical strain (under chronic pain medication), gastroesophageal reflux disease ("GERD") and attention deficit hyperactivity disorder ("ADHD"). (R. 683). In 2009, Dr. Murphy added diagnoses for tension headaches, allergic rhinitis, restless leg syndrome, hyperlipidemia and post-traumatic stress disorder ("PTSD"). In the fall of 2009, following x-rays and consultation with rheumatologist, Dr. Trenbath, Dr. Murphy added a diagnosis of osteoarthritis of the hands. (R. 750). Dr. Murphy also opined that Plaintiff "most probably has a component of fibromyalgia," which was later confirmed by a rheumatologist. (R. 762). In 2010, Plaintiff's arthritic symptoms increased and she was also diagnosed with chronic obstructive pulmonary disease ("COPD"). (R. 772). As of the fall of 2011, Dr. Murphy listed Plaintiff's diagnoses as schizotypal personality disorder, bipolar mood disorder, alcohol dependence, ADHD, asthma, hypothyroidism, chronic cervical disk disease, GERD, hyperlipidemia, PTSD and restless leg syndrome. (R. 825-26).

Dr. Murphy regularly managed Plaintiff's psychotropic medications. Throughout Dr. Murphy's treatment, Plaintiff's mental health showed constant fluctuation between signs of

improvement, followed by times of regression and increased anxiety, depression and alcohol use. Throughout her treatment with Dr. Murphy, Plaintiff went from reporting drinking daily in 2007 to drinking only on rare occasions in 2011. Even after Plaintiff ceased her alcohol use, Dr. Murphy still noted that Plaintiff struggled with anxiety and depression. In addition, Dr. Murphy treated Plaintiff's physical conditions and prescribed medications.

Dr. Murphy also completed "general physicals" and evaluations for the West Virginia Department of Health and Human Resources on April 24, 2007, May 14, 2007, August 19, 2008, October 20, 2009 and May 25, 2011. In each of these evaluations, Dr. Murphy assessed Plaintiff's conditions and found that she was disabled. Dr. Murphy also completed a Mental Residual Functional Capacity Assessment on September 1, 2009 in which she noted mainly marked and extreme limitations in Plaintiff's ability to work. (R. 689; Ex. No. 23F). Additionally, Dr. Murphy completed a Primary Care Physician Questionnaire, which included her opinion as to Plaintiff's limitations on her ability to perform work; Dr. Murphy ultimately opined that Plaintiff is not capable of performing any full-time job on a sustained basis. (R. 703).

### b. Seneca Health Services Clinic, Dr. Lois Urick

Plaintiff first presented to Seneca Health Services to address her alcohol issues in April 26, 2006. (R. 464).Plaintiff was on no medications at the time and reported strained interpersonal relationships and frequent suicidal ideations. (*Id.*). Dr. Lois Urick, a psychiatrist at the clinic, first conducted a psychiatric evaluation of Plaintiff on February 7, 2007. (R. 460-61). Dr. Urick diagnosed Plaintiff with major depressive disorder, severe without psychotic features; alcohol dependence; dysthymic disorder; partner relational problem; bereavement; he also noted to a "rule out" diagnosis of Personality Disorder. (*Id.*).

On May 31, 2006, Plaintiff presented to Seneca Health Services to be evaluated by Dr. Urick to determine if she needed to be placed on medications. (R. 713-14). Dr. Urick recommended medication and monitored Plaintiff's medication regimen during her treatment at the Clinic. Plaintiff continued treatment at the clinic through July 2007.

On May 11, 2007, Dr. Urick provided a Psychiatrist's Summary to the West Virginia Department of Health and Human Resources Medical Review Team. (R. 501). Dr. Urick stated that his last patient contact was February 2007. (*Id*.). He diagnosed Plaintiff with major depressive disorder and alcohol dependence and classified her prognosis as fair. (*Id*.). Dr. Urick stated that he anticipated Plaintiff's disability to last over one year and that her "ability to maintain employment is impaired by mental illness." (*Id*.).

### c.      Seneca Health Services Clinic, Shelia Ware

Ms. Shelia Ware worked as a case manager at Seneca Health Services and met with Plaintiff on May 31, 2006, July 12, 2006, August 28, 2006 and October 27, 2006. During her appointments, Plaintiff discussed her depression, anxiety, alcohol use, sleep problems and social isolation. (R. 721). Ms. Ware classified Plaintiff's main problem at the time as substance abuse/dependence and her goal was to decrease Plaintiff's alcohol abuse and dependency. (R. 725). Ms. Ware also helped to monitor Plaintiff's medication and communicated adjustments to Dr. Urick. (R. 719, 721). Ms. Ware's last treatment note stated that Plaintiff was doing about the same: still easily aggravated, drinking, having problems sleeping and feeling that her medications are not working. (R. 728).

### d.      Seneca Health Services Clinic, Breant Hammond

Breant Hammond met with Plaintiff for psychotherapy appointments at Seneca Health

Services on July 12, 2006 and spoke with her over the phone on August 30, 2006. Mr. Hammond noted that Plaintiff drinks to self-medicate and is "escaping dealing with her feelings at the immediate time." (R. 715). Mr. Hammond further noted that Plaintiff is "not dealing with the death and problems in her family." (*Id.*). In regard to her alcohol use, Mr. Hammond discussed with Plaintiff how controlled drinking was not working for her and that she should abstain completely. (R. 715-16). Plaintiff also complained to Mr. Hammond that she did not feel her medication was working. (R. 727).

### e.    Seneca Health Services Clinic, Mark Malcomb

Plaintiff met with therapist, Mark Malcomb, M.S., at Seneca Health Services for behavioral health counseling on November 15, 2006, January 4, 2007, February 7, 2007, February 18, 2007, March 28, 2007, May 16, 2007 and July 18, 2007. These appointments addressed Plaintiff's alcohol dependence, depression, strained interpersonal relationships and grief associated with her mother's death. (R. 732). Mr. Malcomb noted that her response to treatment is poor due to Plaintiff's unwillingness to actively participate in treatment. (R. 733). Plaintiff still continued drinking, even though she did decrease her use over time. Following her hospitalization in February 2007, Plaintiff reported that her new medication was alleviating some of her depressive symptoms. (R. 738). Despite this initial improvement, Plaintiff still reported having "good days and bad days" and experiencing depression. (R. 739, 740, 742). Mr. Malcomb noted that Plaintiff's symptoms remain consistent, with her depression neither increasing nor decreasing and there was still a barrier to reducing Plaintiff's alcohol consumption. (R. 740).

### f.    Fairmont General Hospital, Inpatient Hospitalization

On February 9, 2007, Plaintiff was admitted at the Emergency Room at Fairmont General

Hospital with severe depression and suicidal ideation. (R. 467, 473). Plaintiff stated she had developed increased suicidal ideations with thoughts of overdosing, experienced decreased energy, decreased concentration and feelings of hopelessness. (*Id.*). A psychiatric evaluation conducted on February 10, 2007 reviewed Plaintiff's mental health history and symptoms. (R. 484-89). The examining physician noted that Plaintiff demonstrated symptoms of social phobia. (*Id.*). Plaintiff was diagnosed with major depressive disorder, severe and recurrent without psychotic symptoms; alcohol and cannabis dependence; social phobia; personality disorder; and a rule-out diagnosis of post-traumatic stress disorder. (R. 487). Plaintiff was discharged twelve days later with improved conditions, no significant alcohol withdrawal symptoms, decrease in racing thoughts and alleviation of suicidal ideation and irritability. (R. 471). Doctors placed Plaintiff on a new medication regimen. (*Id.*). Upon discharge, Plaintiff was diagnosed with bipolar disorder, type two; depression; history of social phobia; personality disorder, not otherwise specified; tension headaches; and moderate psychosocial stressors. (R. 471-72).

### g.    Webster County Memorial Hospital Emergency Room

On April 10, 2007, Plaintiff presented to the emergency room at Webster County Memorial Hospital. (R. 491). Plaintiff's chief complaint were muscle spasms in her neck, nausea and tingling in her hands. (*Id.*). Plaintiff stated she was under a lot of stress, which impacts her conditions. (*Id.*). Plaintiff was issued a prescription and discharged. (R. 492).

On February 18, 2011, Plaintiff presented to Webster County Memorial Hospital Emergency Department experiencing weakness and problems with mobility over the last three to four months. (R. 810). Plaintiff further reported chronic pain all over and spasms in her back. (R. 811-12). A CT scan of Plaintiff's head was ordered and blood collected. (R. 811). The diagnostic

impression of the emergency room physician was fibromyalgia and Plaintiff was discharged with medication and told to follow-up with Dr. Murphy. (R. 813). The CT scan revealed no evidence of acute intracranial abnormality. (R. 818).

### h.    Kitra Burnham, LCSW

Kitra Burnham worked as a licensed clinical social worker ("LCSW") at Camden-on-Gauley Medical Center.[1] (R. 709-12). Plaintiff attended therapy sessions with Ms. Burnham on July 27, 2009, August 10, 2009, September 10, 2009, September 17, 2009 and December 2, 2009. Upon her initial evaluation, Ms. Burnham diagnosed Plaintiff as having personality disorder, PTSD, major depression, severe and recurrent, ADHD and alcohol/poly-substance abuse/dependence. (R. 711). Plaintiff's presenting problems during her sessions included situational stress, anxiety, depression , physical illness, as well as problems with work/school, family, other relationships and substance abuse. (R. 704, 706, 707, 746).

### i.    Rheumatologist, Dr. R. Trenbath, M.D.

On August 24, 2009, Plaintiff visited Camden-on-Gauley Medical Center for an appointment with Dr. R. Trenbath, M.D., a rheumatologist. (R. 676). Plaintiff stated that she is retaining fluid, that it is hard for her to make a fist in her left hand and that several of the joints in her fingers hurt on her left hand. (*Id.*). Dr. Trenbath assessed Plaintiff's conditions as 1) peripheral edema, 2) hypothyroidism, 3) hyperlipidemia, and 4) multiple psychiatric diagnoses. (*Id.*). Dr. Trenbath did not feel Plaintiff needed to see a rheumatologist at this time. (*Id.*).

### j.    Summersville Regional Medical Center

The record indicates Plaintiff fractured her finger when she fell down the stairs while walking her dog. (*Id.*). On February 22, 2010, Plaintiff went to Summersville Regional Medical

---

[1] Most of Kitra Burnham's medical records are ineligible. The summaries of Ms. Burnham's notes cited herein

Center regarding pain in her pinky finger on her right hand. (R. 778). Dr. Vice concluded that

that "there appears to be healing slightly angulated fracture at the base of the proximal phalanx

of the fifth digit of the right hand." (*Id.*). On March 3, 2010, Plaintiff met with a physical

therapist due to experiencing stiffness and weakness in her right pinky finger. (R. 768). The

physical therapist noted that Plaintiff's rehab potential was fair. (*Id.*). Plaintiff returned to

Medical Center on March 7, 2010 regarding complications with her pinky finger. (R. 779).

### k. Dr. Bandy Mullins

Dr. Bandy Mullins met with Plaintiff in the summer of 2010 due Plaintiff's chronic

diarrhea. On June 13, 2010, Plaintiff was hospitalized for three days and underwent clinical

laboratory tests related to her chronic diarrhea. (R. 784-86). Plaintiff underwent a colonoscopy

with biopsy on June 15, 2010. (R. 787). The colonoscopy and biopsy revealed "mildly inflamed

colonic mucosa with erosion of the surface epithelium, focal fresh hemorrhage into the lamina

propria and detached fragments of fibrinopurulent debris" and no malignancy identified. (R.

789). The biopsy also revealed a hyperplastic polyp. (*Id.*). Dr. Darlene Gruetter noted that the

biopsy is suggestive of an "ischemic colitis or pseudo-membranous colitis." (*Id.*). Plaintiff had

further appointments with Dr. Mullins on June 30, 2010 and July 28, 2010, presenting with

continued abdominal pain and diarrhea. (R. 809, 903, 904). Dr. Mullins prescribed Plaintiff a

new medication to help continue to resolve the diarrhea. (R. 903). Dr. Mullins noted that

Plaintiff's condition started to show improvement and concluded that Plaintiff's primary care

physician would be able to manage her conditions from this time forward. (*Id.*).

### l. Rheumatologist, Dr. Wassim S. Saikali

On September 14, 2011, Plaintiff's attorney referred Plaintiff for an evaluation with Dr.

indicate only those portions of her notes that were legible and not a complete summary of the record.

Wassim S. Saikali, M.D., a rheumatologist. (R. 886). Dr. Saikali noted that he did not have any records for the evaluation but reviewed with Plaintiff her history of present illness, rheumatologic and family history and he conducted an examination. (*Id.*). Dr. Saikali's impression was that Plaintiff has "classic refractory fibromyalgia as evidenced by the tender and generalized aches and pains." (*Id.*). Dr. Saikali further stated that Plaintiff has bluish discoloration and possibly Raynaud's phenomenon so he suggested ruling out collagen vascular disorder although he did not see swelling for rheumatoid or scleroderma. (*Id.*). Dr. Saikali recommended additional testing and that Plaintiff should continue her medication and noted that she would possible benefit from going to a pain clinic. (*Id.*). Dr. Saikali concluded that "progress for significant improvement is not very good." (*Id.*).

On September 29, 2011, Dr. Saikali reviewed x-rays of Plaintiff's hands, knees and feet. (R. 906). Plaintiff's hand and feet findings were normal. (*Id.*). The x-rays of Plaintiff's knees revealed that Plaintiff's patella was slightly on the low side on the right without joint space narrowing. (*Id.*). The impression of the x-ray found no evidence of rheumatoid arthritis. (*Id.*).

2. **Consultative Examinations and Evaluations**

a. **Kathy Ghaler**

On June 7, 2007, a West Virginia Department of Health and Human Resources Disability/Incapacity Evaluation was completed by Kathy Ghaler [sic] and a reviewing physician. (R. 497-98). The physician marked that Plaintiff was "Disabled – SSI-Related Medicated 18/Over." (R. 497). The physician noted that Plaintiff has a medically determinable impairment or combination of impairments that significantly limits her ability to perform basic work activity and that her impairments meets or equals the listing of impairments. (R. 498).

### b. Psychologist Larry Legg, M.A.

On October 25, 2007, Larry Legg, M.A., a licensed psychologist, completed a mental status examination for the West Virginia Disability Determination Service. (R. 521). Dr. Legg's assessment was based on his examination of Plaintiff and reviewing a one-page medical progress note completed by Dr. Murphy on May 29, 2007. (R. 523). Mr. Legg conducted a clinical interview reviewing Plaintiff's psychosocial history, chief complaints, presenting symptoms and medical history. (R. 521-26). Plaintiff reported several manic or mixed episodes over the last year although she was currently suffering from a depressive episode. (R. 522). Plaintiff defined herself as a "recluse" but Mr. Legg did not observe any significant social or interpersonal deficits or reduced capacity for close relationships during the interview. (R. 523). As part of the mental status examination, Mr. Legg noted that Plaintiff's stream of thought was within normal limits, some suspiciousness and paranoia were present in her thought content.  (R. 525).  Her judgment, concentration, persistence and immediate, recent and remote memory were judged to be within normal limits. (*Id.*). Plaintiff's pace and social functioning were classified as mildly deficient. (*Id.*). In conclusion, Mr. Legg listed Plaintiff's diagnoses as alcohol dependence with physiological dependence, bipolar I disorder, restless leg syndrome, neck and shoulder pain, migraines, and bursitis in knees. (R. 525-26).

### c. Dr. Curtis Withrow, M.D.

On October 30, 2007, Dr. Curtis Withrow, M.D. conducted a Physical Residual Functional Capacity Assessment of Plaintiff. (R. 528). Dr. Withrow listed Plaintiff's primary diagnosis as restless leg syndrome, secondary diagnosis of headache, and other alleged impairments as psychiatric. (*Id.*). Dr. Withrow found no exertional, postural, manipulative,

visual, communicative or environmental limitations had been established. (R. 528-33). In regard to Plaintiff's symptoms, Dr. Withrow noted that Plaintiff "presents evidence of significant psychiatric symptoms." (R. 533). Dr. Withrow concluded that Plaintiff did not present medical evidence of a significant limitation of physical functional work activity. (R. 535).

### d.     Dr. Bob Marinelli, M.D.

On October 30, 2007, Dr. Bob Marinelli, Ed.D completed a Mental Residual Functional Capacity Assessment of Plaintiff. (R. 536). Dr. Marinelli concluded that Plaintiff's mental residual functioning capacity "is reduced by moderate limitations in sustained persistence and social functioning." (R. 538). Dr. Marinelli also noted that Plaintiff had mild limitation in the restriction of activities of daily living and no episodes of decompensation of extended duration. (R. 550). Dr. Marinelli found that evidence does not establish the presence of "C" criteria and further stated that Plaintiff "has the capacity for routine competitive employment involving short and simple to mildly complex instructions with low pressure and social demands." (R. 538, 551). Dr. Marinelli noted, however, that medical records were insufficient to assess Plaintiff's Title II claim. (R. 552). Overall, Dr. Marinelli opined that Plaintiff "has improved with treatment and can function in an appropriate work environment" and that Plaintiff's "reports of functioning appear partially credible." (*Id.*).

### e.     Dr. Joseph Shaver

On June 19, 2008, Dr. Joseph Shaver completed a Psychiatric Review Technique of Plaintiff. (R. 582). Dr. Shaver noted mild limitations in restrictions in daily living activities, moderate limitations in maintaining social functioning and maintaining concentration, persistence or pace, and no episodes of decompensation. (R. 592). Dr. Shaver noted that the

evidence did not establish the presence of any "C" criteria. (R. 593). Dr. Shaver stated that Plaintiff reported difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, stair climbing, memory, completing tasks, concentration, and getting along with others. (R. 594). She also does not handle stress or changes in routine well. (*Id.*).

Dr. Shaver noted mainly moderate limitations in Plaintiff's ability to perform work activities in his June 19, 2008 Mental Residual Functional Capacity Assessment. (R. 597). In regard to social interaction, Dr. Shaver noted that Plaintiff was moderately limited. (*Id.*). Dr. Shaver concluded that Plaintiff's reported activities of daily living "appear to be consistent" with the available medical records and "it is therefore believed that [Plaintiff] is generally credible regarding her reported mental functioning." (R. 598). Dr. Shaver further concluded that based on the available medical records, Plaintiff "retains the mental capacity to operate in routine, low stress, work situations that require only two to three step operations, limited social interaction and minimal production quotas." (*Id.*).

### f.     Psychologists Reshanda Plummer, M.A., and William Hagerty, M.A.

On July 22, 2008, Plaintiff underwent a Psychological Evaluation conducted by supervising psychologist, Reshanda Plummer, M.A., and licensed psychologist, William Hagerty, M.A. (R. 656.). The psychologists interviewed Plaintiff and administered a mental status exam and Kaufman Brief Intelligence Test ("KBIT-2"). (*Id.*). Plaintiff reported her previous treatment and social history as well as her current medications. (*Id.*). As part of the mental status examination, the psychologists classified Plaintiff's psychomotor behavior as slightly agitated, her eye contact fair, her thought processes as logical and sequential, her mood irritable and affect labile, she was oriented and cooperative, her insight appeared poor, judgment

14

limited, and attention and concentration mildly impaired. (R. 657). Her immediate and remote memory appeared intact with her recent memory being mildly impaired. (*Id.*). On the KBIT-2 test, Plaintiff obtained an IQ Composite score of 86, which places her in the low average range of intellectual functioning. (*Id.*). Plaintiff's Axis I diagnosis included major depressive disorder, recurrent, mild, and alcohol dependence; Axis II, personality disorder, not otherwise specified; Axis III, degenerative disc disease, edema, bursitis, hypothyroidism, fibromyalgia, lung problems, migraines, restless leg syndrome (by report); Axis IV, employment difficulties, difficulties with the social environment, lack of social support and death in the family. (R. 657-58). The psychologists concluded that:

> the results of the KBIT-2 indicate that she is functioning in the low average range of intellectual functioning, which indicates that she would not have any significant difficulty learning new skills nor an impaired ability to build off the skills she has already learned. However, if the depression and interpersonal relationship difficulties are not appropriately managed, these symptoms would interfere with the acquisition of new skills and possibly the length of time it would take to learn them.

(R. 658). The psychologists made the following recommendation:

> if [Plaintiff's] medical and mental health symptoms are left untreated, further and more serious symptom severity could increase causing permanent disability; therefore, she would definitely be unable to participate in competitive employment. However, if she is able to receive medical benefits that allow her to receive the necessary medical, psychological and psychiatric treatment and testing, it could slow down or prevent any further complications and allow her to participate in competitive employment.

(*Id.*). They also recommended that Plaintiff see further consultations with a rehabilitation and vocational counselor "to determine if any additional rehabilitation services would be beneficial to enable her to gain active employment." (*Id.*). However, the psychologists noted that if rehabilitation or vocational counseling determines that Plaintiff is unable to work due to her physical and/or psychological disabilities, then they recommended that "this information be

given to the appropriate authorities to determine if she would be eligible for Social Security Disability." (*Id.*). They also recommended that she undergo a second psychological evaluation to determine whether her Axis I and II diagnoses are appropriate and "to what extent, if any, they would impact her ability to participate in competitive employment." (R. 659).

g.    **Psychologist, Olga E. Gioulis, M.S.**

On August 25, 2009, Olga E. Gioulis, M.S., a licensed psychologist, completed a Psychiatric Review Technique (R. 861-74), a Mental Residual Functional Capacity Assessment of Work-Related Abilities (R. 875-80), and a Psychological Report (R. 881-85). As part of the Psychiatric Review Technique, Ms. Gioulis noted that Plaintiff meets listing 12.04 (affective disorders). (R. 861). Ms. Gioulis did not find that Plaintiff met the "B" Criteria of the Listings and found moderate restrictions in activities of daily living and maintain social functioning, mild limitations in maintaining concentration, persistence or pace, and no episodes of decompensation. (R. 871). Ms. Gioulis did find that the "C" Criteria were met based on Plaintiff's:

> medically documented history of a chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and…a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate.

(R. 872).  In conclusion, Ms. Gioulis noted that Plaintiff "is severely depressed with chronic worry and sporadic suicidal ideation" as well as history of alcohol abuse to tolerance. (R. 873). Ms. Gioulis noted Plaintiff's depressive symptoms included anhedonia or pervasive loss of interest in almost all activities, sleep disturbance, decreased energy, feelings of guilt or worthlessness and thoughts of suicide; she further noted that Plaintiff's manic syndrome includes

flight of ideas. (R. 864). Ms. Gioulis opined that Plaintiff likely has PTSD due to a history of childhood physical and sexual abuse, marriage to an abusive husband for twelve years, and continuing grief over the death of two siblings from drug overdoses. (*Id.*). Ms. Gioulis stated that Plaintiff is credible in her presentation of symptoms. (*Id.*).

Ms. Gioulis also completed a Mental Residual Functional Capacity Assessment. (R. 875). Ms. Gioulis found mild to moderate limitations in Plaintiff's ability to perform work. In support of this opinion, Ms. Gioulis commented that Plaintiff is "severely depressed, worries and ruminates, this affects her judgment and decision making." (*Id.*). In regard to social functioning, Ms. Gioulis noted mild to moderate limitations. (R. 877). In support of this opinion, Ms. Gioulis commented that Plaintiff is severely depressed, withdrawn and keeps to herself and has low self-esteem. (R. 878). Ms. Gioulis further noted that Plaintiff is moderately limited in her ability to tolerate ordinary work stress due to her depression, worry, keeps to self, poor self esteem and dependence. (*Id.*). Ms. Gioulis noted that she feels the impairments and limitations have existed at their current level of severity since May 1, 2006, Plaintiff's alleged onset date. (*Id.*).

Ms. Gioulis also completed a Psychological Report on Plaintiff on August 25, 2009. (R. 881). Ms. Gioulis discussed Plaintiff's family history and employment. (*Id.*). Ms. Gioulis also reviewed Plaintiff's health information, including her mental health diagnoses and treatment for bipolar disorder and depression. (*Id.*). Ms. Gioulis administered the following tests: Wechsler Adult Intelligence Test (WAIS), Wide Range Achievement Test (WRAT), Bender Visual-Motor Gestalt Test (Bender), Minnesota Multiphasic Personality Inventory (MMPI), Clinical Interview and Review of Records. (R. 883). Plaintiff's WAIS score yielded an IQ of 85, which placed her in the low average range of intellectual abilities. (*Id.*). Ms. Gioulis noted that her poor

performance may have been affected by her anxiety and lower concentration. (*Id.*). Ms. Gioulis noted that Plaintiff's WRAT scores were in agreement with her WAIS results. (*Id.*). Plaintiff's Bender's test ruled out an organic mental problem and were within normal limits. (*Id.*). Plaintiff's MMPI test suggested "significant psychological problems." (*Id.*). Ms. Gioulis noted that the results may be somewhat exaggerated due to a request for help and the presence of high stress. (*Id.*). Ms. Gioulis explained that similar individuals are ruminative or obsessive, lacking in assurance and common sense, tending to be passive and feeling inadequate. (*Id.*). Suicide potential was also present, which Plaintiff endorsed but denied any active thoughts. (*Id.*). Plaintiff's MMPI indicates "severe depression and worry, withdrawal, apathy and lethargy. (*Id.*).

Ms. Gioulis' diagnostic impression included an Axis I diagnosis of bipolar type II disorder, most recent depressed, a rule out diagnosis of post-traumatic stress disorder (based on past abuse and sibling overdose) and an Axis III diagnosis of bursitis with chronic pain, fibromyalgia, restless leg syndrome and asthma. (R. 884). In summary, Ms. Gioulis commented that Plaintiff has chronic depression with manic episodes and that she may also have PTSD related to her past history of abuse and her continuing grief and anxiety over her siblings' deaths. (*Id.*). Her MMPI suggests "severe depression and worry, withdrawal and lethargy," she "tends to be ruminative and to feel inadequate," she has "experienced suicidal ideation sporadically for the past two years," and "she endorses many somatic complaints. (*Id.*). Ms. Gioulis further opined that Plaintiff seems capable of living alone and managing her finances. (*Id.*).

### h. Psychologist Michael C. Sheridan, M.A.

On September 1, 2011, Michael C. Sheridan, M.A., a licensed psychologist, conducted a psychological evaluation after being referred by Plaintiff's primary care physician and attorney

to help adjust Plaintiff's plan of care and to help determine her eligibility for SSA disability benefits. (R. 827, 831). Mr. Sheridan utilized the Bender Visual-Motor Gestalt Test, the Wechsler Adult Intelligence Scale, the Wide Range Achievement Test, Substance Abuse Subtle Screening Inventory and Minnesota Multiphasic Personality Inventory. (*Id.*). Mr. Sheridan reviewed Plaintiff's background information, including her family history and significant relationships. (R. 827-28).

In regard to the results of the test administered, Mr. Sheridan found that Plaintiff received an average score on the Bender-Gestalt test. (R. 833). For the Wechsler Adult Intelligence Scale, Plaintiff's composite scaled scores "ranged from borderline in working memory to average in the verbal comprehension composite." (*Id.*). Her IQ score of 82 places her in the low average range of general intellectual functioning. (*Id.*). On the Wide Range Achievement Test, Plaintiff's subtests were "solidly average, placing her skills at the high school level or perhaps slightly above." (R. 834). Mr. Sheridan noted that it "appears that her academic skills are adequate to manage a household budget and perform other household tasks such as routine correspondence." (*Id.*). For the Substance Abuse Subtle Screening Inventory, Plaintiff "tripped 3 of the 9 decision rules," which means she "yielded a high probability of having a substance dependence disorder." (*Id.*). In regard to the Minnesota Multiphasic Personality Inventory, which is used to determine the type and severity of Plaintiff's mental health problems, she produced results that were "consistent with symptom exaggeration as a result of severe psychopathology, consistent with her mental health history." (*Id.*). Mr. Sheridan explained that "[b]ecause of that pathology, she chose the 'deviant' option on the vast majority of the items" and that the "resulting clinical profile is probably invalid." (*Id.*).

In his summary and conclusions, Mr. Sheridan stated that Plaintiff has a "long-term history of depression and difficult social adjustment." (*Id.*). She has a history of poor relationships with other family members, but does report that her children are supportive. (*Id.*). He stated that "clinically, she presents as severely depressed with disjointed speech, constricted affect, significant anhedonia, and near total inability to function independently." (*Id.*). Mr. Sheridan noted that she complains of both auditory and visual hallucinations and "clearly displays irrational patterns of thought which do tend to exacerbate her depression." (*Id.*). He further noted that she has a history of alcohol dependence, which appears to be in remission. (*Id.*). Mr. Sheridan's diagnostic impressions were major depressive disorder, recurrent, severe, with psychotic features, alcohol dependence in remission, personality disorder, multiple medical complaints, disintegration of the family structure, including the death of two siblings by overdose, recent imprisonment of a third sibling, failing romantic relationship and financial stress. (R. 835).

In a Psychiatric Review Technique completed on September 13, 2011, Mr. Sheridan notes that Plaintiff meets listing 12.04 (Affective Disorders) and equals the listing of 12.08 (Personality Disorders). (R. 841). Mr. Sheridan characterized the Affective Disorder as anhedonia, appetite and sleep disturbance, psychomotor agitation or retardation, decrease energy, difficult concentrating or thinking and hallucinations, delusions or paranoid thinking. (R. 844). Mr. Sheridan further marked that Plaintiff equals the Personality Disorder 12.08 listing, which is characterized as "inflexible and maladaptive personality traits which cause either significant impairment in social or occupational functioning or subjective distress." (R. 848). Mr. Sheridan marked that Plaintiff's personality disorder was evidenced by seclusiveness or autistic thinking,

oddities of thought, perception, speech and behavior, persistent disturbances in mood or affect, pathological dependence and passivity and intense and unstable interpersonal relationships and impulsive and damaging behavior. (*Id.*). Mr. Sheridan also noted substance addiction disorders under listing 12.09 stating that Plaintiff consumed in excess of twenty-four beers per day for many years, received on DUI and has been in remission for three years. (R. 849).

Under "B" Criteria of the Listings, in regard to her functional limitations, Mr. Sheridan noted extreme limitations in activities of daily living, maintaining social functioning, maintaining concentration, persistence or pace and noted four or more episodes of decompensation, each of an extended duration. (R. 851). Mr. Sherdian also marked that Plaintiff meets the "C" Criteria of the Listings, noting that Plaintiff has a documented history of an affective disorder (12.04) of at least two years duration and that she also has repeated episodes of decompensation, each of extended duration, a residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicated to cause the individual to decompensate, and a current history of one or more years' inability to function outside a highly supportive living arrangement with an indication of continued need for such an arrangement. (R. 852).

On September 13, 2011, Mr. Sheridan also completed a Mental Residual Functional Capacity Assessment of Work-Related Abilities. (R. 855-60). Mr. Sheridan noted moderate to extreme limitations in Plaintiff's ability to perform work. (R. 856). Mr. Sheridan noted extreme limitations in Plaintiff's ability to sustain attention, concentration, persistence, work pace, normal work scheduled and normal work routines; he explained this opinion is supported by Plaintiff's major depressive symptoms, including her inability to leave the couch for days at a

time. (R. 856-57). In regard to social functioning in the work environment, Mr. Sheridan noted mild, moderate, marked and extreme limitations. (R. 857). Mr. Sheridan based this opinion off of Plaintiff's major depressive symptoms with psychotic features. (R. 858). Mr. Sheridan opined that Plaintiff has had these impairments and limitations at their current level of severity since May 1, 2006, the alleged onset date. (*Id.*).

## C.    *Testimonial Evidence*

On order of remand from the Appeals Counsel, Plaintiff's case appeared before ALJ Swayze, a different ALJ than the first administrative hearing. At the hearing, ALJ Swayze stated that rather than being a supplemental hearing, he would be mindful of the Appeals Council concerns but would in effect conduct a *de novo* hearing. (R. 124).

At the time of the second administrative hearing, Plaintiff was forty-four (44) years old. (R. 127). Plaintiff has been unemployed since 2001. (R. 133). Her prior employment primarily involved working as a waitress. (R. 131-35). Her last job was working at an ice cream stand for approximately three months. (R. 131-32). She also worked for one day at a convenience store in 2007. (R. 319; Pl.'s Mot. at 2). Plaintiff obtained her GED in 1993 but she has not taken any classes or received additional vocational training. (R. 130). Plaintiff received food stamps and benefits through her medical assistance card. (R. 131).

Plaintiff discussed her current treatment providers. Plaintiff testified that she has been seeing her primary care doctor, Dr. Murphy, for approximately five years, and that Dr. Murphy prescribes all of her current medication. (R. 136). Plaintiff explained that she voluntarily chose not to seek treatment at Seneca Health Services with Dr. Urick and various therapists because she did not find such treatment to be helpful. (R. 136, 138). Plaintiff stated that talking to these

doctors and counselors about her problems did not make her feel better and often made her feel

worse and increased her desire to drink alcohol. (R. 138).

## C. *Vocational Evidence*

Dr. Larry Kontosh, a vocational expert, also testified at the hearing. (R. 150). Mr.

Kontosh characterized her prior work as an informal waitress, semiskilled. (R. 152). Plaintiff's

work at the ice cream stand was classified into two different positions: a counter clerk, light

exertional level and semiskilled, and a kitchen helper, medium and unskilled. (*Id.*). Based on

Plaintiff only working at the ice cream stand for about three months and the position's "specific

vocational preparation" ("SVP") level of four, the ALJ determined that Plaintiff's only past

relevant work was as a waitress and eliminated Plaintiff's position at the ice cream stand as past

relevant work. (R. 154).

In regard to Plaintiff's ability to return to her prior work, Dr. Kontosh gave the following

responses to the ALJ's hypothetical:

> Q: Assume a hypothetical individual of the same age, education and work experience
> as the claimant, who retains the capacity to perform light work with the following
> non-exertional limitations. No more than occasional postural movements. This
> includes balancing, stooping, kneeling, crouching, crawling, climbing of ramps
> and stairs. There should be no climbing of ladders, ropes or scaffolds. No
> overhead lifting or reaching. No more than frequent handling bilaterally. The
> work should avoid concentrated exposure to irritants such as fumes, odors, dust,
> gases and poorly ventilated areas, as well as hazards, including dangerous
> machinery and unprotected heights. Work should be limited to simple, routine
> and repetitive one to three step tasks performed in a low stress environment with
> no more than minimal production quotas, and…there should be no more than
> occasional interaction with the public, supervisor and coworkers. Could this
> hypothetical individual perform any of the past work of the claimant as actually
> performed or as customarily performed per the <u>DOT</u>?
>
> A: No, sir.
>
> Q: Would there be any other jobs in the regional or national economy that this
> hypothetical individual could perform?

(R. 154-55). The ALJ responded that the following jobs meet the conditions: a garment folder, light and unskilled; a garment hand washer, light and unskilled; a house cleaner, light; and, an inspector hand packer, light and unskilled. (R. 155).

The ALJ directed the VE to review Exhibit 23F, which is the Mental Residual Functioning Capacity Assessment of Work-Related Abilities completed by Plaintiff's primary care doctor, Dr. Jessica Murphy, on September 1, 2009. (R. 689-94). When asked if a hypothetical individual with the limitations as described in the exhibit would be able to perform any past work of Plaintiff, the VE said no. (R. 155-56). When asked if other jobs in the regional or national economy could be performed by the hypothetical individual with the limitations as listed in the exhibit, the VE said no. (R. 156). The VE explained his assessment was based on the "extreme limitations on sustaining concentration and attention, maintaining regular attendance and completing a normal work day, as well as the marked limitations in carrying out simple instructions and understanding simple instructions, as well as making simple work related decisions." (*Id.*).

The ALJ then directed the VE to Exhibit 24F, which is a Primary Care Physician Questionnaire, completed by Dr. Jessica Murphy on September 1, 2009. (R. 695-703). The ALJ asked the VE to consider whether a hypothetical individual limited as described in this exhibit could perform Plaintiff's past work. (R. 156). The VE testified that the record contained an inconsistency regarding whether Plaintiff needed to alternate positions frequently. (R. 156-57). The VE also pointed out a contradiction because Dr. Murphy noted that frequent rest periods from work are needed at patient's discretion that could exceed customary tolerance. (*Id.*). The VE also testified that "[a]bsences greater than seven to ten times a year for medical reasons

would preclude competitive employment" and that the questionnaire stated the patient would miss work twice a month. (R. 157). The VE concluded that the individual assessed in Exhibit 24F would not be able to perform Plaintiff's past work or any other jobs in the regional or national economy. (*Id.*).

The ALJ conducted a similar analysis for Exhibit 41F, a Mental Residual Functional Capacity Assessment of Work-Related Abilities completed by Michael C. Sheridan, M.A. with Greenbrier Valley Mental Health. (R. 855-60). Again, the ALJ asked if a hypothetical individual as described in this exhibit would be able to perform Plaintiff's past work or other jobs in the national or regional economy and the VE said no. (R. 157-58). The VE explained that the "extreme limitations on attention and concentration, regular attendance and completing a normal work day and exercise of judgment. The moderate limitations on carrying out and understanding simple instructions and remembering instructions preclude work." (R. 158).

The ALJ directed the VE to review Exhibit 43F and again comment on whether the hypothetical individual as described in the document could perform Plaintiff's past work or any jobs in the regional or national economy. (*Id.*). Exhibit 43F is a Mental Residual Functional Capacity Assessment of Work-Related Abilities completed by Olga E. Gloulis, M.S., a licensed psychologist. (R. 875-80). The VE stated that the "moderate ability to complete a normal work day one-third of the time" as well as "regular, moderate or occasional restriction on regular attendance" as described would "preclude[] competitive employment" (R. 159).

Finally, the ALJ questioned Dr. Kontosh about the "customary tolerances that a typical employer would have as to an employee being late to work or having unexcused or unscheduled absences" and the number and length of breaks that are typically permitted during the workday.

(*Id.*). The VE stated that "one to two times over the course of employment" would be tolerated for absences and for breaks typically include "ten to fifteen minutes in the morning and afternoon and thirty to sixty minutes at lunch." (*Id.*). The VE further testified that during an eight-hour work day a typical employer would permit an employee to be off task in addition to regularly scheduled breaks for approximately ten percent of the time. (*Id.*). The VE concluded that if a person would need to exceed one or more of these tolerances regarding absences and breaks on a regular basis that "fulltime, competitive employment is not possible." (*Id.*).

The VE's stated that his testimony throughout the hearing was consistent with the <u>DOT</u> and to the extent that it may be inconsistent with information in the <u>DOT</u>, the testimony was consistent with the VE's personal experience. (R. 159-60).

Plaintiff's attorney questioned Dr. Kontosh regarding the ALJ'a first hypothetical and added the additional limitation of never crouching or crawling and "infrequently…only a few times in an eight-hour day, stoop, kneel or squat." (R. 160). The VE testified that the garment folder, hand washer and inspector would not be negatively impacted by the additional restriction. (*Id.*). At the close of the hearing, Plaintiff's attorney requested that the record reflect that Plaintiff "threw up into the trash can, or at least couched up into the trash can during the hearing." (R. 162).

### III.   CONTENTIONS OF THE PARTIES

In Plaintiff's motion for summary judgment, she asserts that the Commissioner's decision "is not supported by substantial evidence." (Pl.'s Mot. at 1). Specifically, Plaintiff alleges that:

- "There is a lack of support for the ALJ's Physical RFC when he failed without sufficient cause to afford weight to the medical opinion regarding physical functional limitations of treating physician Dr. Jessica Murphy." (Pl.'s Mem. in Supp. of Mot. for Summ. J. ("Pl.'s Mem.") at 5, ECF No. 10-1).

- "There is lack of support for the ALJ's Mental RFC when he failed to include at least a moderate limitation in complet[ing] a normal workday, which was the least severe limitation assessed by all psychologists and Dr. Murphy." (*Id.* at 11).

- "The ALJ relied upon jobs that were inconsistent with his RFC requiring 'occasional overhead lifting and reaching' when the DOT provides that all jobs require frequently reaching in all directions; the ALJ failed to comply with SSR 00-4p and did not resolve the conflict between the VE testimony and the DOT." (*Id.* at 14).

Plaintiff asks the Court to "find that the final decision of the Commissioner is not supported by substantial evidence and award benefits to the Plaintiff" or in the alternative "reverse and remand to the Commissioner for correction of errors and a new hearing." (*Id.* at 15).

In Defendant's motion for summary judgment, she asserts that the decision is "supported by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically, Defendant alleges that:

- Plaintiff is not fully credible and the "ALJ was persuaded by Plaintiff's inconsistent statements, lack of specialized treatment, and positive response to treatment. (Def.'s Br. in Supp. Of Def.'s Mot. for Summ. J. ("Def.'s Br.") at 7-8, ECF No. 18).

- The ALJ properly concluded that Plaintiff retained the RFC to perform a range of light work. (*Id.* at 10).

- The VE testimony supports the ALJ's finding that Plaintiff can work in the national economy and is not disabled. (*Id.* at 13).

## IV.     STANDARD OF REVIEW

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied. *See* 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ."); *Richardson v. Perales*, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. at

> 401, 91 S. Ct. at 1427 (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. *See Laws v. Celebrezze*, 368 F.2d at 642; *Snyder v. Ribicoff*, 307 F.2d 518, 529 (4th Cir. 1962).

*Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit has defined substantial evidence as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. *Laws,* 368 F.2d at 642.

Because review is limited to whether there is substantial evidence to support the ALJ's conclusion, "[t]his Court does not find facts or try the case *de novo* when reviewing disability determinations." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, "the language of § 205(g)…requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V.  DISCUSSION

### A.  *Standard for Disability and the Five-Step Evaluation Process*

To be disabled under the Social Security Act, a claimant must meet the following criteria:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…"[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

*See* 42 U.S.C. § 423(d)(2)(A) (2006).  The Social Security Administration uses the following

five-step sequential evaluation process to determine if a claimant is disabled:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

> (iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings…and meets the duration requirement, we will find that you are disabled.

> [Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record…" 20 C.F.R. §§ 404.1520; 416.920 (2011).]

> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.

> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§  404.1520; 416.920 (2011).  If the claimant is determined to be disabled or not

disabled at any of the five steps, the process does not proceed to the next step.  *Id.*

**B.**     ***Discussion of the Administrative Law Judge's Decision***

Utilizing the five-step sequential evaluation process described above, the ALJ made the

following findings:

1.  **The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.**

2.  **The claimant has not engaged in substantial gainful activity since May 1, 2006, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

3. The claimant has the following severe impairments: Obesity; Bipolar Disorder; Personality Disorder; history of Alcohol Dependence; and Refractory Fibromyalgia (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she is limited to occasional balancing, stooping, kneeling, crouching and climbing of ramps and stairs. She should never climb ladders, ropes or scaffolds. She is limited to occasional overhead lifting and reaching, and frequent bilateral handling. She should avoid concentrated exposure to irritants (such as fumes, odors, dust, gases and poorly ventilated areas) and hazards (including dangerous machinery and unprotected heights). The claimant is limited to work involving simple, routine and repetitive one to three step tasks performed in a low stress environment with no more than minimal production quotas. She should have only occasional interaction with the public, co-workers and supervisors.

6. The claimant is unable to perform any past relevant work (20 CFR 416.965 and 416.965).

7. The claimant was born on January 3, 1967 and was 39 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 416.963 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 20 CFR 416.969 and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 1, 2006, through the date of this decision (20 CFR 404.1520(g) and

**416.920(g)).**

**12.** **The claimant's alcoholism is not material to the finding of disability (20 CFR 404.1535 and 416.935).**

(R. 20-51).

*C.*      *Analysis of the Administrative Law Judge's Decision*

**1.**      **The ALJ Failed to Properly Follow the Treating Source Opinion Rule**

Plaintiff alleges that the ALJ's Physical and Mental RFC lack support due to affording little weight to Plaintiff's treating physician, Dr. Jessica Murphy, and for failing to include limitations assessed by the other medical source opinions. (Pl.'s Br. at 11). The ALJ did not give Dr. Murphy's opinion controlling weight and then assigned "not great" or "not significant" weight to her various medical opinions regarding Plaintiff's conditions and limitations. (R. 36, 39, 41, 43). Defendant argues that the ALJ "properly evaluated the opinion of Plaintiff's family physician, as well as other medical sources of record." (Def.'s Br. at 10). Defendant also asserts that a treating source's opinion is "not automatically entitled to great or controlling weight" and noted that the ultimate issue of determining a claimant's residual functional capacity or whether the person is disabled is an issue reserved to the Commissioner. (Def.'s Br. at 11).

**a.**      **Treating Source Opinion Rule**

The opinion of a treating physician will be given controlling weight if the opinion is 1) well-supported by medically acceptable clinical and laboratory diagnostic techniques and 2) not inconsistent with other substantial evidence in the case record. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); *see also Hines v. Barnhart*, 453 F.3d 559, 563 n.2 (4th Cir. 2006) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)) ("The treating physician rule is not absolute. An 'ALJ may choose to give less weight to the testimony of a treating physician if

there is persuasive contrary evidence.'"). However, "treating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight or special significance." SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996). For example, the Commissioner is responsible for determining whether a claimant is disabled or unable to work. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Therefore, a medical source that offers an opinion on whether an individual is disabled or unable to work "can never be entitled to controlling weight or given special significance." SSR 96-5p, 1996 WL 374183, at *5. However, "a treating physician's opinion is entitled to great weight and may be disregarded only if persuasive contradictory evidence exists to rebut it." *Craig v. Chater*, 76 F. 3d 585, 589 (4th Cir. 1996). The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Mitchell v. Schweiker*, 699 F.2d 185, 187 (4th Cir. 1983).

When an ALJ does not give a treating source opinion controlling weight and determines that the Claimant is not disabled:

> the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight. This explanation may be brief.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). The following factors are used to determine the weight given to the opinion: 1) length of the treatment relationship and the frequency of examination, 2) the nature and extent of the treatment relationship, 3) the supportability of the opinion, 4) the consistency of the opinion with the record, 5) the degree of specialization of the physician, and 6) any other factors which may be relevant, including understanding of the

disability programs and their evidentiary requirements. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). However, the ALJ does not need to specifically list and address each factor in his decision, so long as sufficient reasons are given for the weight assigned to the treating source opinion. *See Pinson v. McMahon*, No. 3:07-1056, 2009 WL 763553, at *11 (D.S.C. Mar. 19, 2009) (holding that the ALJ properly analyzed the treating source's opinion even though he did not list the five factors and specifically address each one).

In the present case, Plaintiff's treating physician, Dr. Jessica Murphy, produced numerous examination notes throughout the course of her treatment relationship with Plaintiff from 2005 to 2011. In addition, Dr. Murphy completed evaluative forms noting her opinion regarding Plaintiff's physical and mental limitations and opining that Plaintiff is unable to maintain full-time employment. The ALJ did not give controlling weight to Dr. Murphy's opinion "as it is not fully supported by the objective medical signs and findings set forth in her progress notes, nor is it supported by the records of the claimant's other treating and examining physicians." (R. 41). The ALJ then gave "not great weight" or "not significant weight" to some of Dr. Murphy's medical opinions while not specifying what weight was given to other opinions. (R. 36, 39-40, 41, 43). While the ALJ is not required to give controlling weight to the Dr. Murphy's opinion and may even assign lesser weight to the treating source doctor's opinion, the ALJ must give sufficient reasons to make clear to any subsequent reviewers the weight given and why. As discussed in full below, the undersigned finds that the ALJ failed to discuss sufficient reasons for why lesser weight was given Dr. Murphy's opinions.

        **b.**      **The ALJ Improperly Followed the Treating Physician Rule in Determining Plaintiff's Physical and Mental RFC**

Plaintiff's treating physician, Dr. Jessica Murphy, discussed Plaintiff's physical

limitations in a Primary Care Physician Questionnaire completed on September 1, 2009. (R. 695-703). This opinion provided a detailed assessment of Plaintiff's physical limitations, including her ability to walk, sit, stand, lift, carry, use her hands, sit upright, etc. (*Id.*). In regard to physical limitations, Dr. Murphy opined that Plaintiff is incapable of performing any full-time job on a sustained basis since her onset date of May 1, 2006. (R. 703). Dr. Murphy also noted that Plaintiff had a degree of "functional overlay" due to mental impairments in combination with her other impairments resulting in a greater degree of disability than either impairment alone. (R. 702). During the administrative hearing, the VE stated that based on these functional limitations listed in Dr. Murphy's Physical Questionnaire, Plaintiff would not be able to perform past work or any other jobs. (R. 157).

The ALJ did not give Dr. Murphy's opinion as to Plaintiff's physical limitations controlling weight. In support of his conclusion, the ALJ explained "the objective signs and findings noted in Dr. Murphy's progress notes concerning the claimant's physical impairments do not warrant the degree of limitation reported by her in this evaluation." (R. 41). The ALJ noted that Plaintiff had not be referred to a specialist at the time and "most of her physical impairments were reportedly well controlled with the use of medications." (*Id.*). The ALJ also stated that there were no imaging studies "that would support the degree of limitation given by Dr. Murphy in regard to the claimant's cervical spine impairment" or studies or findings supporting limitations of Plaintiff's hands or feet.[2] (*Id.*). Moreover, in regard to this specific

---

[2] The undersigned notes that in contrast to the ALJ's assertion that no imaging studies support Dr. Murphy's limitations, on April 3, 2008 Plaintiff received an x-ray of her cervical spine which revealed "some narrowing of the C5-6 disc space and I believe also the C6-7 disc space…the etiology is degenerative." (R. 578). Plaintiff also received an x-ray on October 13, 2009, which showed mild osteoarthritis in her right hand. (R. 752). On September 9, 2011, Dr. Saikali, a rheumatologist concluded that Plaintiff had "classic refractory fibromyalgia as evidenced by the tender and generalized aches and pains." (R. 886). The ALJ pointed to no contradictory evidence regarding these findings in support of his conclusion to reject Dr. Murphy's opinion.

opinion from the Primary Care Physician Questionnaire on September 1, 2009, the ALJ never specified what weight was given to Dr. Murphy's assessment of Plaintiff's physical limitations and restrictions – only that it was not given controlling weight. (R. 41).

In addition to Dr. Murphy's opinions on Plaintiff's physical limitations, Dr. Murphy also provided numerous opinions on Plaintiff's mental disabilities and limitations. The ALJ afforded these opinions lesser weight. Defendant argues that the ALJ "reasonably afforded less weight to Dr. Murphy" because she "was not a mental health specialist," her opinion was "vague and not grounded in objective evidence," she "did not indicate to what degree Plaintiff's long-standing alcoholism affected her ability to work," and she "often used welfare forms to express her opinion that Plaintiff was unable to work." (*Id.* at 11).

On April 24, 2007, Dr. Murphy completed a General Physical for the West Virginia Department of Health and Human Resources in which she diagnosed Plaintiff with bipolar mood disorder, schizotypal personality disorder, alcohol dependence, major depression, and muscular spasms in the neck. (R. 510). While the ALJ did not assign a specific weight to this opinion, the ALJ stated in response to this opinion that "Dr. Murphy is not a mental health specialist, and her records do not support such a degree of limitation," and she "did not indicate the degree to which the claimant's alcohol dependence affected her ability to work." (R. 31).

Dr. Murphy also completed a General Physical form on August 19, 2008 in which she listed Plaintiff's diagnoses as schizotypical personality disorder, bipolar mood disorder, chronic cervical strain with degenerate disc disease, asthma with chronic bronchitis, hypothyroidism, pedal edema, alcoholism and blindness in the right eye. (R. 662). Dr. Murphy stated that "she can hardly function and has used 'alcohol' as a 'deal with it' drug to the point of alcoholism." (R.

663). The ALJ states he did not give "great weight" to Dr. Murphy's opinion because:

> Dr. Murphy stated that the claimant's primary reason for disability was mental, and she is not a mental health specialist. Further she did not indicate to what degree the claimant's alcoholism had affected her ability to work. Dr. Murphy's opinion that the claimant's medical problems also made it difficult for her to work is not supported by objective medical signs and findings.

(R. 36).

Dr. Murphy completed a mental residual functional capacity assessment of Plaintiff on September 1, 2009. (R. 689). Dr. Murphy noted mainly marked and extreme limitations in Plaintiff's ability to understand, remember and carry out instructions, her ability to sustain attention, concentration, persistence, work pace, her ability to keep normal work schedules and normal work routines, as well as moderate to extreme limitations in social functioning. (R. 690-93). The ALJ did not give "significant weight" to Dr. Murphy's opinion because she "is not a mental health specialist, and therefore her opinion is not entitled to controlling weight in this area of functioning. Further her opinion is not supported by the objective medical signs and findings, and is not consistent with the records of the claimant's treating and examining mental health providers." (R. 39-40).

In regard to the Primary Care Physician Questionnaire completed on September 1, 2009, as discussed above, the ALJ did not give controlling weight to Dr. Murphy's opinion because "it is not fully supported by the objective medical signs and findings set forth in her progress notes, nor is it supported by the records of the claimant's other treating and examining physicians" (R. 41). The ALJ further reasoned that "Dr. Murphy gave the claimant a diagnosis of Post-Traumatic Stress Disorder, a diagnosis that was not made by any of the claimant's treating or examining mental health providers, with the exception of a social worker who saw the claimant on one

occasion."[3] (R. 41).

In regard to a general physical form completed on October 20, 2009, the ALJ did not assign a specific weight to Dr. Murphy's opinion but noted that "her opinion that the claimant is mentally unable to handle work situations is not support by the records of the claimant's treating and examining mental health specialists. Her statement that the claimant is barely able to meet her activities of daily living is not support by claimant's own statements." (*Id.*).

The ALJ did not assign a specific weight to Dr. Murphy's opinion from an evaluation completed on May 25, 2011, but stated that "her opinion that the claimant is mentally disabled, unable to work with others and very unstable is not supported by the records of the claimant's treating and examining mental health specialists." (R. 43).

In sum, the ALJ found that Dr. Murphy's opinion regarding Plaintiff's mental limitations is "not inconsistent" or "not supported" by the records of the claimant's treating and examining mental health providers. (R. 36, 39-40, 41, 43). However, the ALJ did not outline the specific treatment notes that were inconsistent with Dr. Murphy's opinions. Upon a careful review of the entire record, the undersigned found no such inconsistency. Instead, the record indicates Plaintiff continually struggled with anxiety and depression even after her decreasing her use of alcohol and that Plaintiff's physical conditions also increased in severity. Therefore, the undersigned finds that the ALJ did not provide sufficient reasons for giving Dr. Murphy's medical opinions lesser weight. While the ALJ is entitled to not give controlling weight to a treating source opinion, the ALJ must provide sufficient reasons for the weight that the ALJ did credit the

---

[3] The undersigned notes that this finding is incorrect. Plaintiff was diagnosed with PTSD by Kitra Burnham, a licensed clinical social worker at Camden-on-Gauley clinic in 2007; this diagnosis is noted at every visit. (R. 746-47, 704-12). Psychiatrist Younus listed PTSD as a "rule out" diagnosis when Plaintiff was first admitted to Fairmont General Hospital in February 2007. (R. 487). Psychologist Olga Gioulis also listed PTSD as a "rule out" diagnosis and stated that Plaintiff "likely has PTSD." (R. 863).

opinion. Accordingly, the ALJ's reasoning fails to comply with the specificity requirements of 20 C.F.R. § 416.1527 and Social Security Ruling 96-2p.

This Court has been persuaded by a comparison to the analysis of another ALJ recently upheld in *Cramer v. Astrue*, No. 9:10-1872-SB-BM, 2011 WL 4055406 (D.S.C. Sept. 12, 2011). *See Smith v. Astrue*, No. 2:11-CV-77, slip op. at 10-11 (N.D. W. Va. June 13, 2012) (Bailey, C.J.). In *Cramer*, Dr. Edward Giove, the plaintiff's primary care physician, opined that the claimant had difficulties with standing, sitting, or walking for extended periods of time because of her degenerative disc disease in the lumbar and cervical spine. *Cramer*, 2011 WL 4055406, at *2, 6. However, the ALJ determined that Ms. Cramer could stand, walk, and sit for six hours during an eight-hour workday. *Id.* at 6. In deciding to give Dr. Giove's opinion little weight, the ALJ determined that the opinion was inconsistent with the doctor's own treatment notes because:

> Dr. Giove's treatment notes from November 2006 reflect the claimant reported improvement of her back pain from prescribed medication. Although the claimant saw Dr. Giove for treatment of other conditions after November 2006, there are no documented reports of her back pain in the record until September 2007. In October 2007, the claimant underwent an MRI of the cervical spine, which revealed degenerative disc disease at C3-C4 through C7-T1. However, in November 2007, Dr. Giove noted the claimant denied back pain at that time.

*Id.* at 9. The *Cramer* court determined that with this analysis, the ALJ "sufficiently described his reasons for giving Dr. Giove's opinion limited weight." *Id.* at 10. In *Smith*, Chief Judge Bailey determined that "only an analysis like the one in *Cramer* is sufficiently specific to comply with 20 C.F.R. § 404.1527 and Social Security Ruling 96-2p." *Smith*, slip op. at 11.

Here, the reasoning of the ALJ falls short when compared to the analysis contained in *Cramer*. While the ALJ generally stated that "objective signs and findings" do not support Dr. Murphy's opinion, that Dr. Murphy never referred Plaintiff to a specialist and her conditions

were "reportedly well controlled with the use of medication," the ALJ must outline the specific treatment notes that were inconsistent with Dr. Murphy's opinion regarding Plaintiff's physical RFC. *See Cramer*, 2011 WL 4055406, at \*9. Similarly, the ALJ found that Dr. Murphy's opinion regarding Plaintiff's mental limitations is "not inconsistent" or "not supported" by the records of the claimant's treating and examining mental health providers. (R. 36, 39-40, 41, 43). However, the ALJ did not outline the specific treatment notes that were inconsistent with Dr. Murphy's opinions. Instead, the ALJ has left the task to the Court to determine which treatment notes conflict with her opinion. However, a court cannot affirm an ALJ's decision based upon *post hoc* reasoning. *See Secs. & Exch. Comm'r v. Chenery*, 332 U.S. 194, 196 (1947) ("[A] reviewing court…must judge the propriety of [agency] action solely on the grounds invoked by the agency."). Moreover, Dr. Murphy was Plaintiff's only treating physician for her physical impairments other than specialists to whom Dr. Murphy referred Plaintiff. The agency also did not obtain a physical consultative physical examination to provide an assessment of Plaintiff's physical conditions other than the medical information provided by Dr. Murphy in the record.

While the ALJ gave little weight to Dr. Murphy's opinion because she is not a mental health specialist, "specialization" is just one of many factors for the ALJ to consider in assigning a weight to the claimant's treating source's opinion. *See* 20 C.F.R. § 404.1527. Other factors include the examining relationship, length of treatment relationship and frequency of examination, nature and extent of treatment relationship, supportability, consistency, etc. *See id.* Dr. Murphy first saw Plaintiff before her on-set date in 2005 and then continued treatment for Plaintiff's physical and mental illnesses through the date of the second administrative hearing in 2011. She kept detailed examination notes, which listed Plaintiff's presenting problems,

diagnoses and medications for over six years. Dr. Murphy prescribed and adjusted Plaintiff's medications, including her psychotropic medications for her mental illnesses. These vast treatment notes by Dr. Murphy comprise the bulk of the record in this case. While the ALJ states that Dr. Murphy's opinion is not supported and is inconsistent with the records of the claimant's treating and examining mental health providers, as discussed above, the ALJ fails to point to specific records demonstrating this inconsistency. Thus, the ALJ's conclusion that Dr. Murphy's opinion is accorded limited weight because she is not a mental health specialist, alone, is insufficient to support the ALJ's decision to assign little weight to Dr. Murphy's opinions.

In sum, the undersigned finds that the ALJ improperly followed the treating physician rule because the reasons given by the ALJ for assigning a lesser weight to Dr. Murphy's opinions are not sufficiently specific under 20 C.F.R. § 416.1527 and Social Security Ruling 96-2p. Therefore, the undersigned recommends that Plaintiff's motion be **GRANTED** as to this issue and that the case be **REMANDED** to allow the ALJ to state what weight was given to Dr. Murphy's opinion of Plaintiff's physical condition and to sufficiently state specific reasons for his decision to attribute little weight to Dr. Murphy's opinions regarding Plaintiff's physical and mental limitations.

## 2. Substantial Evidence Does Not Support the ALJ's Determination of Plaintiff's Mental RFC

Plaintiff argues that the ALJ also failed to include limitations that were assessed by all evaluating psychologists and Plaintiff's treating physician; therefore, the ALJ's mental RFC's is not supported by substantial evidence. (Pl.'s Br. 11). Plaintiff specifically points to the fact that the ALJ failed to include at least a moderate limitation in Plaintiff's ability to complete a normal workday, which was the least severe limitation assessed by Dr. Murphy and all evaluating

psychologists. (*Id.*). During the administrative hearing, the VE testified that a "moderate ability to complete a normal workday one-third of the time (i.e., occasionally) precludes competitive employment." (R. 158). Defendant argues that the ALJ "properly evaluated the opinion of Plaintiff's family physician, as well as the other medical sources of record." (Def.'s Br. at 10). Defendant further argues that substantial evidence supports the ALJ's decision and that Plaintiff is not fully credible. (R. 8-9).

In support of his decision, the ALJ gave "significant weight" to the opinions of State Agency psychologists, Bob Marinelli and Joseph Shaver, as well as psychologist Larry J. Legg, M.A. (R. 34, 49). These examiners found that Plaintiff did not meet any of the listings, and while she did suffer some limitations, Plaintiff was not severely mentally disabled and was able to work. (R. 33, 49).

The ALJ gave little weight to all other medical source opinions in the record, each of which found Plaintiff was either unable to work or that more information was needed to determine her ability to maintain employment.

When there is a conflict in the medical opinion evidence, an ALJ is required to fully explain the weight given to each of the sources and the reasons for according such weight. *See Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984). As the Fourth Circuit explained:

> The courts…face a difficult task in applying the substantial evidence test when the Secretary has not considered all relevant evidence. Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Arnold v. Secretary*, 567 F.2d 258, 259 (4th Cir.1977). Moreover, "[a]ffording the greatest weight to the opinion of two non-treating physician sources cannot be supported by substantial

evidence when a treating source…has provided substantial evidence to the contrary." *Foster v.*
*Astrue*, 826 F. Supp. 2d 884, 886-87 (E.D.N.C. 2011).

Here, the ALJ afforded significant weight to the opinions of three non-treating
psychologists who found Plaintiff was not disabled, but then gave little weight to the opinions of
Plaintiff's two treating physicians, Dr. Murphy and Dr. Urick, and two other non-treating
psychologists, Ms. Gioulis and Mr. Sheridan, who each found that Plaintiff met a listing and was
unable to work. The undersigned finds that Plaintiff's treating source physician provided
substantial evidence to the contrary of the opinions of Mr. Legg, Dr. Marinelli and Dr. Shaver.

Additionally, while the ALJ, for the most part, provided reasons for the weight he
assigned to each medical source opinion, the undersigned finds that the ALJ failed to rationally
and fully explain the weight given to these opinions. For example, the undersigned is concerned
with the reasons given for dismissing Ms. Gioulis and Mr. Sheridan's opinions - that they only
saw claimant once and do not have a longitudinal relationship with Plaintiff – because these
reasons equally apply to all three examining but non-treating physicians to whom the ALJ
accorded significant weight. The opinions of the State Agency psychologists were based on a
single examination of Plaintiff and a limited review of the entire record because they were
conducted in 2007 and 2008, almost three years prior to the administrative hearing. Similarly, the
ALJ dismissed Mr. Sheridan's opinion because it was largely based on "claimant's subjective
complaints" but this same concern was not expressed for Mr. Legg's opinion, in which he
specifically noted "she is the source of the information contained in this report" and he only
reviewed a single one-page medical record in forming his opinion.

Therefore, based on the ALJ's improper application of the treating source opinion rule as

well as the insufficient explanations provided for the weight given to the other medical source opinions, the undersigned cannot find that the ALJ's decision is supported by substantial evidence. Accordingly, the undersigned recommends that Plaintiff's case be remanded to the Commissioner for further analysis of the objective medical evidence, specifically the weight and reasoning for the weight assigned to the treating source and non-treating source opinions.

a. **The ALJ's Credibility Assessment**

While the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," he did not find Plaintiff's statements considering the intensity, persistence and limiting effects of her symptoms to be credible. (R. 46). The ALJ stated that Plaintiff's testimony and statements regarding her symptoms "are not consistent with the objective evidence of the record" and are "inconsistent with the above residual functional capacity assessment." (R. 46). However, as discussed above, the undersigned finds that the ALJ improperly considered the objective medical evidence in the record by improperly applying the treating source opinion rule and improperly weighing the medical source opinions. Therefore, the undersigned will not address the issue of credibility at this time and recommends the case be remanded for a proper assessment of the objective medical evidence as well as the Plaintiff's credibility in light of the record as a whole.

3. **Inconsistency between VE Testimony and DOT**

Plaintiff argues that the ALJ relied upon jobs that were inconsistent with his RFC, which requires only "*occasional* overhead lifting and reaching" when the DOT provides that all jobs listed by the VE require *frequent* reaching in all directions. (Pl.'s Br. at 14) (emphasis added). Based on the evidence provided, there appears to be an inconsistency between the ALJ adopting

the VE's testimony that Plaintiff can perform jobs requiring "*frequent* reaching in all directions" while limiting Plaintiff's RFC to "*occasional* overhead lifting and reaching." Even though the VE testified that Plaintiff could perform the jobs based on his experience and knowledge, no subsequent explanation was provided by the ALJ after he adopted the VE's testimony stating Plaintiff could perform jobs requiring *frequent* reaching in all directions when the ALJ's own RFC limits Plaintiff to only "*occasional* overhead lifting and reaching." Social Security Rule 00-4p states that the "adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information." (SSR) 00-4p, 2000 WL 1898704, at *3. Here, no such explanation was given. (R. 50). However, because the undersigned recommends remanding this case on the issues as set forth above, the undersigned will not rule on the issue of an inconsistency between the VE's testimony and the ALJ's RFC at this time.

## VI.    RECOMMENDATION

For the reasons stated herein, I find that the Commissioner's decision denying Plaintiff's application for supplemental security income is not supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **GRANTED** in part and be **DENIED** in part**.** Consequently, I **RECOMMEND** that Defendant's Motion for Summary Judgment (ECF No. 17) be **DENIED** in part and **GRANTED** in part, and the decision of the Administrative Law Judge be **REMANDED WITH INSTRUCTIONS** as described above.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions

of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 11th day of June.

*/s/ James E. Seibert*
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE